IN THE SUPREME COURT OF NORTH CAROLINA

No. 184A25

Filed 14 August 2026

STATE OF NORTH CAROLINA

v.

KEVIN LEIGH WINGATE

Appeal pursuant to N.C.G.S. § 7A-30(2) (2023) from the decision of a divided panel of the Court of Appeals, 299 N.C. App. 800, vacating judgments entered on 27 July 2023 by Judge Keith O. Gregory in Superior Court, Wake County, and remanding for a new trial. On 30 January 2026, the Supreme Court allowed the State's petition for discretionary review as to an additional issue. Heard in the Supreme Court on 15 April 2026.

*Jeff Jackson, Attorney General, by Tamika L. Henderson, Special Deputy Attorney General, for the State-appellant.*

*George B. Currin and Hart Miles for defendant-appellee.*

EARLS, Justice.

The issues presented here are (1) whether the Court of Appeals erred in holding that the trial court committed plain error when it admitted expert testimony alleged to have constituted improper vouching; and (2) whether the Court of Appeals erred when it determined, in dicta, that an indictment was fatally flawed based on a discrepancy in statutory references. We hold that the Court of Appeals erred in both instances. Accordingly, we reverse the Court of Appeals' judgment.

## I.    Facts

In this case the evidence presented at trial consisted of the victim's testimony and the testimony of four witnesses, three of whom were admitted as expert witnesses. The evidence tended to show that Kevin Wingate sexually abused his son on multiple occasions.

## A. Victim Testimony

James[1] was twelve years old when, as he testified, Mr. Wingate, his father, came into his room to "talk[ ] about the birds and the bees" while James's mother was out of the country on vacation. James was somewhat surprised, but he had expected to receive such a talk at some point. He had learned from his schoolmates about their own awkward conversations. James put down his video game controller and listened to Mr. Wingate's description about what to expect throughout puberty. But James could not have anticipated the turn the conversation would take.

After explaining how James might start growing pubic hair, Mr. Wingate, as James told it, stood up and pulled down his pants. "[H]is penis was in front of my face," James testified. Mr. Wingate then told James to touch his penis, but James refused. Undeterred, Mr. Wingate "grabbed [James's] left hand and made [James] pull [Mr. Wingate's penis] once[,] . . . . [then] twice."

Next, Mr. Wingate wanted to examine James's genitals to, as James put it,

---

[1] "James" is the pseudonym used for the minor victim throughout the Court of Appeals record below.

"see if everything was looking normal." Mr. Wingate then lay down on James's bed and, while fondling his still exposed genitals, asked if James had any questions. That concluded the first "talk." James, unsure what to do once Mr. Wingate left the room, went back to playing video games.

Later that same day, as James recounted, Mr. Wingate reentered James's room. This time, Mr. Wingate wanted to talk to James about James's two uncles, described as "gay," and their bedroom activities. Mr. Wingate told James that his uncles engage in "sword playing," which James understood as touching their penises together. About an hour later, Mr. Wingate offered James pizza in exchange for James "playing" with him "like [James's] uncles play." James refused, and Mr. Wingate gave James a "high five."

James testified that Mr. Wingate's transgressive acts did not cease once James's mother returned from abroad. While James's mother was downstairs one day, Mr. Wingate entered James's room to "wrestle." James testified:

> While we were wrestling, wrestling like normal, then I became overpowered. I was then laying flat on my stomach and then I was—I felt something essentially going inside me about roughly 12 times. The last one, the 12th thrust was the hardest. And during that time I brought my left arm forward to my bed frame to try and get out to try and pull myself out, in which he grabbed my left arm, pulled it back, and which I then hurt my shoulder. I started to cry. He got off me. And I went downstairs and I told my mom that Kevin essentially just hurt my shoulder.

James clarified that while he had been wearing thin cotton "superhero" pajamas, he could nonetheless feel Mr. Wingate's erect penis inside his anus through his pajamas.

James had difficulty using the restroom for some days following this incident.

While James had expected a "talk" based on what he learned from his schoolmates, it was what James later learned from his health class teacher that revealed to him that the "talk," and the "wrestling" that followed, were, in fact, abuse. Sometime after James learned of the abusive nature of Mr. Wingate's actions, he built up the courage to tell his mother, first about the nonpenetrative abuse. James explained that his feelings of shame and guilt initially prevented him from sharing the penetrative abuse with his mother or counselors. Eventually, after working with a therapist, James felt comfortable enough to share details of the remainder of the abuse he suffered.

## B. Indictments

A Wake County grand jury delivered a true bill of indictment on 20 February 2018, indicting Mr. Wingate on one count of taking indecent liberties with a child under N.C.G.S. § 14-202.1. Mr. Wingate was initially arraigned on 25 July 2018, in Superior Court, Wake County.  Mr. Wingate pleaded not guilty and waived a formal reading of charge at that time.

On 5 November 2019, a Wake County grand jury indicted Mr. Wingate on three additional counts of taking indecent liberties with a child (under the same statute), plus one count of "first degree statutory sex offense" under N.C.G.S. § 14-27.29. The indictment for this latter offense attested that "[a]t the time of the act the Defendant was at least eighteen years of age." Section 14-27.29 requires not that the accused be

eighteen years of age but rather, that the defendant is "at least 12 years old and is at least four years older than the victim." N.C.G.S. § 14-27.29(a) (2025).

After an interruption of several years due to the COVID-19 pandemic, the criminal case did not proceed until 2023, when Mr. Wingate was again arraigned on four counts of taking indecent liberties with a child and one count of "first degree statutory sex offense." Mr. Wingate again waived a formal reading and pleaded not guilty on all charges.

## C. Trial Proceedings

### 1. State's Witnesses

Prior to trial, Mr. Wingate's counsel objected to two of the State's proposed expert witnesses. First, as to Miriane Portes, the defense objected on the dual grounds (1) that her credentials as a licensed clinical social worker with a master's degree did not qualify her as an expert in child sexual assault examination, and (2) that her opinions were duplicative, irrelevant, and inadmissible. Defense counsel warned that the State had not submitted documentation regarding the basis for Ms. Portes's testimony and forecast its expectation that her testimony would constitute inadmissible vouching. Second, as to Leigh Howell, the defense objected on essentially the same grounds, arguing (1) that her credentials as a licensed school social worker with a master's degree did not qualify her as an expert in child sexual assault examination, and (2) that her opinions were duplicative, irrelevant, and inadmissible. Defense counsel made the same vouching warning regarding Ms.

Howell's testimony as it did regarding Ms. Portes. The trial court did not sustain Mr. Wingate's pretrial objections.

At trial, the State presented James's testimony, described above, and the testimony of social workers, including Ms. Howell and Ms. Portes, as well as a physician. First, social worker Kennedy Ganyo testified regarding James's case with the Wake County Child Welfare Department. Mr. Ganyo had conducted James's intake and the investigation that followed. Mr. Ganyo recounted largely the same story of nonpenetrative abuse as James did, testifying that James had shared the account during the intake appointment.[2] Mr. Ganyo further testified that he spoke with Mr. Wingate regarding the incident. Mr. Wingate explained to Mr. Ganyo that James "had been asking him about what happens to his penis when he grows up." While Mr. Wingate denied forcing James to touch his penis, Mr. Wingate admitted to Mr. Ganyo that he had exposed his own penis to James to "teach him what's going to happen to his penis."

Next, Ms. Howell, at the relevant time a child abuse evaluation specialist, was admitted as an expert and testified regarding her forensic interview with James.[3] Ms. Howell testified, based on her experience, that children often do not reveal all the details of their abuse right away. Ms. Howell explained that children in abuse

---

[2] A difference between James's recounting and Mr. Ganyo's is that Mr. Ganyo recalled James saying he never touched Mr. Wingate's penis in that instance, despite Mr. Wingate's insistence.

[3] The State played for the jury a video recording of Ms. Howell's interview with James concurrently with her testimony and entered the video into evidence.

situations are often wary of the disruption to their lives that may result from telling the whole story. Ms. Howell further explained that children often disclose abuse "over a period of time . . . to more than one person." Ms. Howell testified that the pattern held true in James's case. James had not revealed the penetrative abuse to Mr. Ganyo, but it seems he did reveal it to Ms. Howell.[4] James had expressed that he did not want to "blind-side[ ]" his mother.

The State's third witness, pediatrician Elizabeth Witman, testified as an expert in pediatrics and child abuse, admitted without objection. Dr. Witman explained that a lack of physical evidence of sexual abuse in children is common. "I'm never surprised when they have a normal exam," Dr. Witman stated. Dr. Witman shared that numerous studies have found that "only about five percent of children who present with a concern that they've been sexually abused will have positive physical findings at the time of their exam." The lack of physical evidence results from the fact that mucous membranes such as the anus heal "extremely quickly and extremely well, and they heal without scarring." Thus, Dr. Witman explained, absent a sexually-transmitted infection, recovering physical evidence of penetrative abuse is exceedingly rare.

Turning to James's case, Dr. Witman testified that she examined him and found no physical evidence of sexual abuse. However, Dr. Witman described the lack

---

[4] While this is not directly stated in the record, it seems to follow contextually from the trial transcript that James discussed the penetrative abuse on the interview video that was played for the jury and entered into evidence.

of physical evidence as "consistent" with James's disclosure of abuse. Mr. Wingate's counsel did not object to this characterization, nor did Mr. Wingate's counsel address the "consistency" assertion on cross-examination.

The State's final witness, Ms. Portes, a clinical therapist, was admitted as an expert in trauma therapy. Ms. Portes testified that James had been referred to her for therapy for sexual abuse. Similar to Ms. Howell's testimony above, Ms. Portes explained that children who have been abused often do not immediately reveal the full scope of their traumatic experiences.

This was the case with James. Ms. Portes guided James through multiple therapy sessions and eventually James opened up to Ms. Portes about both the nonpenetrative and the penetrative abuse incidents. Ms. Portes recounted largely the same details about both incidents as James had described.[5] Ms. Portes characterized Mr. Wingate's actions as "grooming behavior," escalating until the "wrestling" incident and the penetrative abuse. Ms. Portes diagnosed James with post-traumatic stress disorder (PTSD). When asked by the State whether James's PTSD symptoms were "consistent with the trauma he had reported," Ms. Portes answered in the affirmative.

Once again, Mr. Wingate's counsel did not object. On cross-examination,

---

[5] Ms. Portes clarified that James had described two separate incidents in which Mr. Wingate had exposed himself to James: in the first instance, Mr. Wingate exposed his genitals and told James to touch it, which James refused; in the second instance, Mr. Wingate forced James to "pull on [Mr. Wingate's] penis."

however, Ms. Portes clarified that during therapy she is "not focused on the content [of a client's nightmare]," but instead, she "focuse[s] on how the nightmare made [her client] feel."

Mr. Wingate's counsel also inquired about James becoming angry while playing video games, as indicated in Ms. Portes's clinical notes. Ms. Portes responded by explaining that she was interested in finding out where the anger came from, and whether it was toward Mr. Wingate. On redirect, the State picked up the video game thread. Ms. Portes affirmed the State's framing that James's anger "wasn't as much anger about getting [his video game] taken away, it was anger—something about the [video game] was triggering him."

### 2. *Defense's Motion to Dismiss*

At the close of the State's case, Mr. Wingate moved to dismiss all charges for insufficiency of the evidence on the grounds that none of the expert witnesses were witnesses to the events at issue and that they could only testify to their opinions about what James had said to them.[6] The State countered that James's own testimony was sufficient to support conviction on its own. The trial court denied the motion to dismiss.

### 3. *Charge Conference*

---

[6] Mr. Wingate also moved to dismiss all charges based on discrepancies regarding the dates in the indictment, but the trial court, upon its finding that time was not of the essence, allowed the State to amend the dates over the defense's objection. The indictment date issue is not before this Court.

During the charge conference, the parties agreed that the first substantive offense would be listed as "statutory sexual offense with a child *by an adult*" and that the jury instruction would be taken from the associated pattern instructions.[7] (Emphasis added.) Regarding the most serious charge, the trial court instructed the jury, without objection, as follows:

> Statutory sexual offense with a child *with a[n] adult*. The Defendant has been charged with statutory sexual offense with a child *by an adult*. For you to find the Defendant guilty of the offense, the State must prove three things beyond a reasonable doubt.
> First, that the Defendant engaged in a sexual act with the alleged victim. A sexual act means: anal intercourse, which is any—which is any—which is any—I can't say that—which is any penetration, however slight, of the anus of any person by the male sexual organ of another.
> Second, that at the time of the act, the alleged victim was a child under the age of 13 years.
> And third, that . . . at the time of the act, the Defendant was *at least 18 years of age*.

(Emphases added.)[8]

### 4. *Jury Verdict*

On 27 July 2023, the jury found Mr. Wingate guilty of three counts of indecent liberties with a child under one file number, an additional count of the same under another file number, and one count of, as the verdict sheet read, "first-degree

---

[7] The parties also agreed that the multi-count offense would be listed as four counts of "taking indecent liberties with a child."

[8] The trial court also instructed the jury regarding four separate counts of taking indecent liberties with a child.

statutory sex offense" under a third file number.

### 5. *Sentencing*

At the sentencing hearing, held the same day, Mr. Wingate's defense counsel asked the trial court to consolidate all the charges for one sentence of 192 months, the minimum for a Class B1 felony at Mr. Wingate's Level I prior record level. *See* N.C.G.S. § 15A-1340.17(c) (2025). At that point, the State did not interject, nor did the trial court question the range contemplated by Mr. Wingate's defense counsel. Shortly thereafter, however, as the court handed down its sentence, the following exchange occurred between the trial court and the State:

> THE COURT: . . . [T]he jury having found you guilty of *first-degree statutory sex offense*, you being a prior record level I, I'm going to—this being a B1 felony, I'm going to sentence you to 240 months' minimum to—
>
> [THE STATE]: Your Honor—Judge, may I quickly, that's the—that is the *big B1*, that's the 300 to 420.
>
> THE COURT: Okay. You know what, Madam DA, I was looking at the wrong one on that. I apologize.
>
> [THE STATE]: That's the statutory mandatory.
>
> THE COURT: Yes, 300 to 420. I was looking at the wrong one.
> Well, once again, the jury having found you guilty, I'm going to sentence you to 300 months minimum to 420 months maximum.

(Emphases added.) Mr. Wingate's defense counsel made no objection.

The trial court subsequently sentenced Mr. Wingate to sixteen to twenty-nine months on each of the four counts of taking indecent liberties with a child. The court

ordered that all the sentences run consecutively, for a total of 364 to 536 months in prison.

## II.    Court of Appeals Proceedings

In a split decision, the Court of Appeals vacated the trial court's sentence and remanded for a new trial on the bases (1) that the testimony of Ms. Portes and Dr. Witman both constituted improper vouching and (2) that the indictment failed to properly place Mr. Wingate on notice of the crime charged. *State v. Wingate*, 299 N.C. App. 800, 807, 810 (2025). First, citing *State v. Hall*, 330 N.C. 808, 821 (1992), the Court of Appeals held that the trial court erred (1) in admitting James's PTSD diagnosis as substantive evidence that the abuse occurred, and (2) in admitting the explanation that a lack of physical evidence of penetrative abuse was consistent with James disclosing sexual abuse. *Wingate*, 299 N.C. App. at 805–06.

Regarding indictment sufficiency, the Court of Appeals found that the "various references to defendant's charge" throughout the record prevented Mr. Wingate from being able to prepare for trial. *Id.* at 809. The Court of Appeals explained:

> Contained within defendant's indictment were all the facts necessary to convict under § 14-27.28; however, § 14-27.29 is a lesser-included offense, as it contains all the same elements except the adulthood of the defendant. It was *uncertain* under the indictment with which offense defendant had been charged, as was made clear by the confusion of the trial court.

*Id.* at 809–10. Based on the foregoing analysis, the Court of Appeals vacated the trial court's sentence and remanded Mr. Wingate's case for a new trial. *Id.* at 810.

Additionally, the Court of Appeals, in dicta, applied this Court's holding in *State v. Singleton*, 386 N.C. 183, 210 (2024), which requires a showing of actual prejudice to support a claim of insufficient indictment. *Wingate*, 299 N.C. App. at 809–10. The Court of Appeals opined that Mr. Wingate was prejudiced here because of the substantial difference between the possible sentences under N.C.G.S. §§ 14-27.28 (statutory sexual offense with a child by an adult) and 14-27.29 (first-degree statutory sexual offense). *Id.* at 810.

Writing in dissent, Chief Judge Dillon would have vacated only the sentence and remanded for entry of judgment sentencing Mr. Wingate under N.C.G.S. § 14-27.29 (first-degree statutory sexual offense). *Id.* at 810–11 (Dillon, C.J., dissenting). The Chief Judge agreed with the majority that the indictment prejudiced Mr. Wingate, and he agreed that the vouching testimonies of Ms. Portes and Dr. Witman were improper, but he would have held that the trial court did not err in admitting the testimonies for two reasons. *Id.* at 810, 812. First, citing *State v. Williams*, 370 N.C. 526 (2018), and *State v. Jones*, 355 N.C. 117, 133 (2002), the Chief Judge explained that a trial court commits plain error with respect to admission of evidence only where the trial court had previously held the evidence inadmissible or where a specific affirmative duty to intervene exists. *Wingate*, 299 N.C. App. at 811 (Dillon, C.J., dissenting). Furthermore, the Chief Judge reasoned that Mr. Wingate's failure to object could have been a defense strategy intended to prevent drawing the jury's attention to the vouching. *Id.* Second, the Chief Judge would have held that Mr.

Wingate failed to show that the jury's verdict would probably have been different absent the improper vouching as required under *State v. Reber*, 386 N.C. 153, 160 (2024). *Wingate*, 299 N.C. App. at 811 (Dillon, C.J., dissenting).

## III.   Analysis

### A. Plain Error Review

While the Court of Appeals analyzed the propriety of the admission below, this Court need not decide whether the alleged vouching itself was in fact improper, because that issue is not before us. The precise issue before us is whether the admission of the alleged vouching, if it were improper, would constitute plain error. We hold that it did not amount to plain error because we cannot conclude that without that evidence the jury probably would have reached a different result in this case.

This Court reviews the Court of Appeals holding regarding the improper vouching issue for abuse of discretion, applying our plain error precedent. Generally, preserving an issue for appeal requires an objection or motion at trial. N.C. R. App. P. 10(a)(1). However, an issue in a criminal trial court action "may be made the basis of an issue presented on appeal when the judicial action questioned is specifically and distinctly contended to amount to plain error." N.C. R. App. P. 10(a)(4).

In *State v. Lawrence*, 365 N.C. 506 (2012), this Court reviewed its various and sometimes conflicting precedents regarding plain error. We then clarified that to establish plain error, the defendant bears the burden of showing: (1) that a fundamental error occurred at trial; (2) that the error had a "probable impact" on the

jury verdict such that "absent the error, the jury probably would have returned a different verdict"; and (3) that the error was "exceptional," typically such that it affected "the fairness, integrity, or public reputation of judicial proceedings." *Lawrence*, 365 N.C. at 518–19.

To determine whether the assumed error had a probable impact on the jury verdict, we start with the understanding that uncorroborated victim testimony, even standing alone, suffices for conviction where it establishes every element of the offense. *State v. Quarg*, 334 N.C. 92, 95, 100 (1993) (citing *State v. Vehaun*, 34 N.C. App. 700, 705 (1977), *cert. denied*, 294 N.C. 445 (1978)) (upholding a conviction for taking indecent liberties with a child despite improper admission of a PTSD diagnosis on cross-examination, because independent victim testimony was sufficient to convict).

Looking at all the evidence in the case, here the State presented other evidence supporting the jury's finding of guilt independent of the alleged vouching testimony. Ignoring entirely the testimonies of Ms. Portes and Dr. Witman, the testimonies of Mr. Ganyo and Ms. Howell corroborate the criminal claims and stand unobjected-to in the record. Even if the jury had only heard James's testimony and seen Mr. Wingate's apparent age, it would have been properly equipped to reach a guilty verdict.[9] No facts were introduced at trial that would make such a finding

---

[9] The jury could have properly adduced Mr. Wingate's age by seeing him in open court. *See State v. Gray*, 292 N.C. 270, 286 (1977) ("[T]he jury may base its determination of a

unreasonable. James testified that his father showed him his penis, and the jury believed him. James testified that his father "examined" James's penis, and the jury believed him. James testified that his father penetrated his anus, and the jury believed him. The jury believed a survivor's testimony and convicted the accused.

There is nothing in the record here to indicate that without the two experts' testimonies, the jury would *probably* have reached a different verdict. "Probably" is operative, and as we explained in *Reber*, "the proper consideration [is] not the strength of the State's evidence, but whether, 'absent the error, the jury *probably* would have reached a different result.' " 386 N.C. at 160 (emphasis added) (quoting *State v. Maddux*, 371 N.C. 558, 564–65 (2018)). Like the dissent below, this Court is not persuaded that the jury would have *probably* ignored the entirety of James's testimony if not for two experts briefly noting that his PTSD symptoms and physical examination results were consistent with the abuse he described. There is no indication that James required such corroboration to be believable. Because the expert testimony was not such that it would *probably* change the outcome in this case, we hold that its admission was not plain error.

---

defendant's age on its own observation of him even when the defendant does not testify." (citing *State v. Overman*, 269 N.C. 453, 470 (1967))).

Additionally, at sentencing, Mr. Wingate's defense counsel noted he was sixty years old. Because that attestation occurred after the close of the State's case, this Court takes judicial notice of Mr. Wingate's age as is its prerogative. N.C.G.S. § 8C-1, Rule 201(f) (2025) ("Judicial notice may be taken at any stage of the proceeding."); *see State v. Vogt*, 200 N.C. App. 664, 669 (2009) (noting that appellate courts can take judicial notice (citing *State ex rel. Utils. Comm'n v. S. Bell Tel. & Tel. Co.,* 289 N.C. 286, 288 (1976))).

## B. Sufficiency of Indictment

This Court reviews the sufficiency of the indictment de novo, as did the Court of Appeals below, because the sufficiency of an indictment is a jurisdictional issue, which may be raised for the first time on appeal. N.C. R. App. P. 10(a)(1); *see State v. McKoy*, 196 N.C. App. 650, 652 (2009); *State v. Harwood*, 243 N.C. App. 425, 427–28 (2015). Thus, the sufficiency of an indictment is an automatically preserved issue regardless of a lack of objection at trial. *Singleton*, 386 N.C. at 210. Upon review, we hold that the indictment was sufficient.

As the Court of Appeals noted below, an indictment is sufficient if (1) "[t]he offense is charged in a plain, intelligible, and explicit manner"; (2) "[t]he offense is charged properly so as to avoid the possibility of double jeopardy"; and (3) "[t]here is such certainty in the statement of the accusation as to enable the accused to prepare for trial and to enable the court, on conviction or plea of [n]olo contendere or guilty to pronounce sentence according to the rights of the case." *Wingate*, 299 N.C. App. at 809–10 (quoting *State v. Reavis*, 19 N.C. App. 497, 498 (1973)). An incorrectly listed statute or a mistake in the name of the offense in a bill of indictment is not necessarily a fatal flaw. *Reavis*, 19 N.C. App. at 498; *State v. Billinger*, 213 N.C. App. 249, 257 (2011); *see also United States v. Cotton*, 535 U.S. 625, 630 (2002) (stating that "defects in an indictment do not deprive a court of its power to adjudicate a case," which was adopted by this Court in *Singleton*, 386 N.C. at 209).

Notwithstanding the above, the State retains a "duty to draft indictments in a manner that 'satisf[ies] both statutory strictures . . . and constitutional purposes.' " *Singleton*, 386 N.C. at 210 (alterations in original) (quoting *State v. Lancaster*, 385 N.C. 459, 462 (2023)). This duty was the basis for the Court of Appeals stating in dicta that Mr. Wingate was prejudiced at trial. The Court of Appeals dicta application of *Singleton* was mistaken.

"An indictment might fail to satisfy constitutional purposes by failing to provide notice sufficient to prepare a defense and to protect against double jeopardy . . . or [by] failing to assert facts supporting every element of a criminal offense." *Id.* (cleaned up) (first quoting *Lancaster*, 385 N.C. at 462; and then quoting N.C.G.S. § 15A-924(a)(5) (2023)). However, "jurisdictional defects are rare, only arising where an indictment wholly fails to allege a crime against the laws or people of this State." *Id.* at 184. Typographical defects do not invalidate an indictment that properly pleads all essential elements because the included elements cure any ambiguity. *See* N.C.G.S. § 15A-924(a)(6) (2025) ("Error in the [statutory] citation or its omission is not ground for dismissal of the charges or for reversal of a conviction."). So long as an indictment substantially tracks the language of the statute, an indictment is generally valid because it has provided the defendant adequate notice. *State v. Williams*, 368 N.C. 620, 626 (2016) (citing *State v. James*, 321 N.C. 676, 681 (1988)).

The statute under which Mr. Wingate was sentenced provides that "[a] person

is guilty of statutory sexual offense with a child by an adult if the person is *at least 18 years of age* and engages in a sexual act with a victim who is a child under the age of 13 years." N.C.G.S. § 14-27.28(a) (2025) (emphasis added). The statute further provides that violation of the statute comprises a Class B1 felony, sentenced as under Article 81B of Chapter 15A of the General Statutes "except that in no case shall the person receive an active punishment of less than 300 months" and that "the court may sentence the defendant to active punishment . . . up to and including life imprisonment without parole" if certain aggravating circumstances are found. N.C.G.S. § 14-27.28(b), (c) (2025).

The statute under which Mr. Wingate was sentenced specifies that the offense in section 14-27.29 is a lesser included offense. N.C.G.S. § 14-27.28(d) (2025). Section 14-27.29 differs slightly from section 14-27.28 in providing that "[a] person is guilty of first-degree statutory sexual offense if the person engages in a sexual act with a victim who is a child under the age of 13 years and the defendant is at least 12 years old and is at least four years older than the victim," compared to the "at least 18 years of age" under subsection 14-27.28(a). A violation under section 14-27.29 is still a Class B1 felony, N.C.G.S. § 14-27.29(b) (2025), but without the additional sentencing guidelines included in subsections 14-27.28(b) and (c).

Mr. Wingate correctly points out that the indictment, in relevant part, was for "first degree statutory sex offense" under section 14-27.29, while he was sentenced for "statutory sexual offense with a child by an adult" under section 14-27.28. This

-19-

Court is sensitive to the fact that such a mismatch has the potential for harm. However, the supporting factual allegations in the indictment included that Mr. Wingate was over eighteen years old at the time in question, an assertion of limited relevance to the former statute but dispositive to the latter in that it tracks the latter statute's language.

It is undisputed that Mr. Wingate is both over eighteen years old as well as more than four years older than his son James. Being sixty years old at trial in July 2023, Mr. Wingate would have been in his mid-fifties when the events at issue occurred in 2017. James's testimony at trial established him to have been twelve years old in 2017. Thus, at the relevant time, Mr. Wingate was both (a) over eighteen years old as required under N.C.G.S. § 14-27.28(a) (statutory sexual offense with a child by an adult) and (b) over twelve years old and more than four years older than his victim, James, as required under N.C.G.S. § 14-27.29(a) (first-degree statutory sexual offense). The remaining element of each criminal offense is the same: engaging in a sexual act with the victim—the jury found this element met based on the evidence at trial. Thus, notwithstanding the back-and-forth references between the two statutes throughout the record, the same asserted facts meet all the elements of both statutes.

Mr. Wingate's argument before this Court is that he was prejudiced because, had he known he was being tried for the statute with the more severe penalty, that information would have influenced his decision to proceed to trial rather than

accepting a plea agreement. The Court of Appeals accepted this argument. We disagree.

This Court does not often decide questions of fact such as the motivation behind trial actions by counsel, and we need not do so here. Regardless of whether Mr. Wingate's counsel (1) failed to notice the discrepancy or (2) noticed it and chose to ignore it as a trial strategy, the determinative fact on appeal is this: throughout the arraignment, the trial, and the charge conference, Mr. Wingate and his defense team heard the phrase "by an adult" appended to the charge multiple times. Most importantly, the trial court instructed the jury on the proper statute, which means we must assume the jury applied the proper law to the evidence before it. Even after the State told the trial court to look to the "big B1" for sentencing, Mr. Wingate's defense counsel said nothing.

Because it incorporated an essential element of the crime, the factual assertion in the indictment that Mr. Wingate was over eighteen years old showed from the beginning the State's intention to charge him with statutory sexual offense with a child *by an adult*. Taking the indictment as a whole renders the incorrect statutory reference akin to a scrivener's error.

The North Carolina General Statutes anticipated this issue, specifying that a criminal pleading must contain "[f]or each count a citation of any applicable statute, rule, regulation, ordinance, or other provision of law alleged therein to have been violated" but also clarifying that "[e]rror in the citation or its omission is not ground

for . . . reversal of a conviction." N.C.G.S. § 15A-924(a)(6). This is consistent with this Court's jurisprudence, as we have over a century of precedents holding that "[t]he Court will not distinguish and divide a hair betwixt South and Southwest side" where typographic errors occur in various other contexts. *State v. Woolard*, 119 N.C. 779, 781 (1896) (cleaned up); *see, e.g.*, *In re B.J.H.*, 378 N.C. 524, 549 n.8 (2021) (noting date discrepancy in factual findings in parental rights proceeding as harmless scrivener's error); *In re A.L.A.*, 379 N.C. 383, 390 n.4 (2021) (noting almost identically to *In re B.J.H.* that a date discrepancy in a finding of fact in a parental rights proceeding was harmless scrivener's error); *Canady v. Creech*, 288 N.C. 354, 358 (1975) ("Having constructive notice of the facts upon which the claim of lien is based, [a party] may not take advantage of a scrivener's error in the claim . . . upon which they did not rely to defeat a lien . . . ."); *City of Raleigh v. Morand*, 247 N.C. 363, 367–68 (1957) (holding in zoning dispute that one incorrect statutory reference in a factual finding was not fatal where other references were correct); *Flake v. Bd. of Comm'rs*, 192 N.C. 590, 593 (1926) ("[P]ublished notice referr[ing] to an election to be held under chapter 135 instead of 136 [of the General Statutes] . . . was a typographic error which did not invalidate the petition, the order, or the election.").

The indictment provided Mr. Wingate all the information he needed to defend against the more serious charge that ultimately was the crime the jury was instructed to consider. In light of our precedent in multiple other contexts and the language of N.C.G.S. § 15A-924(a)(6), we hold the incorrect statutory reference in Mr. Wingate's

indictment to be harmless scrivener's error. By extension of the same reasoning, the incorrect statutory references that occurred intermittently throughout the proceedings were harmless instances of *lapsus linguae* because Mr. Wingate's notice of the crime for which he was charged cured those mistaken references. *Cf. State v. Sanders*, 280 N.C. 81, 86 (1971) (holding that trial court instruction that the defendant entered the building "with the consent" of the owner, rather than "without the consent" of the owner, was *lapsus linguae* and did not warrant a new trial in a breaking and entering case because "[i]n view of the charge as a whole and the total absence of any evidence the owner consented to the entry, it is apparent the jury could not have misunderstood the court's language").

In sum, constructive notice of the charges against him was available to Mr. Wingate. Whether notice was actually received is an issue of effectiveness of counsel, not one for appeal in this posture. Accordingly, we hold that, because of the unambiguous supporting language included in the indictment, plus the constructive notice available at trial as to the nature of the charges, the flaws in Mr. Wingate's indictment were not fatal.

To be sure, this holding should not be read to relieve the State of its duty to draft satisfactory indictments. *See Singleton*, 386 N.C. at 210. The State must allege information sufficient, taken as true, to support each element of the criminal charge. *See id.* Moreover, this holding should not be read to enable a "bait-and-switch," in which the State leads a criminal defendant to believe that one charge is at issue, only

to clarify at sentencing that it was a lesser included charge all along and the more serious charge is the correct one. This holding also should not be taken to mean that an improper statutory reference is *always* harmless. But where, as here, from the language of the indictment and all the circumstances at trial, a defendant knows or should know with what crime he has been charged, the improper statutory reference in an indictment is not fatal.

## IV.    Conclusion

Having held (1) that the Court of Appeals erred in holding that the trial court committed plain error when it admitted expert testimony alleged to have constituted improper vouching, and (2) that the Court of Appeals erred when it determined, in dicta, that an indictment was fatally flawed based on a discrepancy in statutory references, the judgment of the Court of Appeals is hereby reversed.

REVERSED.